## Furjanick Estate.

Argued October 2, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Paul N. Barna,* for appellant.

*George O. Frazier,* with him *D. M. Anderson, Jr.,* for appellee.

OPINION BY MR. JUSTICE BELL, November 9, 1953:

Peter (Pit) Furjanick, an unmarried man 83 years of age, and his niece Susan (Sue) Furjanick, resided together in a property of the decedent situated in Donora, Pennsylvania. On December 13, 1945 they went together to his bank where he had a savings account and a checking account which were carried in his name only. At Peter's request, which will be hereinafter discussed at length, these accounts were closed and a new savings account and checking account carrying the same balances were created in their joint names, the signature cards reading as follows:

486

"PIT FURJANIC OR SUE FURJANIC
Joint Savings Account*

. . .

(Signed) Pit Furjanic
(Signed) Sue Furjanic, Niece"

At that time each of them signed the following agreement which was on the reverse side of said signature card: "The undersigned do hereby open a joint deposit account with Union National Bank, Donora, Pa. (Hereinafter called The Bank) and *agree each with the other*\*\* and with the said bank that all sums heretofore or hereafter deposited by either or both of said joint depositors, with the said bank to their credit as such joint depositors, with all accumulations thereon, *are and shall be owned by them jointly, with the right of survivorship* and not as tenants in common, and be subject, in whole or in part, at any time and from time to time, during the life of both, to the check or order of withdrawal of both or either of them; and that *upon the death of either the balance in said account shall belong to the survivor of them,* and payment thereof to or on the check of the survivor shall be valid and discharge the said bank from all liability. Each of the undersigned appoints the other his or her Attorney-in-fact to endorse any check, draft, note, or other instrument payable to his or her order or to the order of both, and to deposit the same or any other moneys to said joint account.

"It is further stipulated that *this agreement is not revocable except,* by written notice to the said bank *signed by both depositors,* and that such notice shall not affect transactions theretofore made.

---

\* The other signature card was exactly the same except that it read "Joint Checking Account".

\*\* Italics, throughout, ours.

"Witness our hands and seals this day of Dec. 13, '45 A. D. 19—.

(Signed) Pit Furjanic (Seal)

(Signed) Sue Furjanic (Seal)

Witness: (Signed) Ben. G. Binns"

The court below found: "It is also undisputed that at time the transfer was made there was to the credit of testator [Peter] in the savings account the sum of $6,071.50—the exact amount in checking account at such time was not disclosed by the testimony of the witnesses, but from signature card appears to have been $4,743.79.

"It is also undisputed that at date of death of decedent there was a balance in the joint savings account of $21,907.67, and in the joint checking account there was a balance of $1,325.46, and that from the date of the creation of such joint accounts, to date of death of the testator, all additional deposits to such accounts were made by him with his own funds and all withdrawals were likewise made by or for him; that no withdrawal was made by the niece during decedent's lifetime, but that subsequent to the death of the testator, the balances in both accounts had been withdrawn by his niece, and held by her for her own benefit."

Peter Furjanick died testate June 3, 1949 leaving a balance of personal estate, excluding the aforesaid savings and checking accounts, of $6,192.87. By his last will dated February 26, 1949, he specifically devised two houses and lots to Sue and all of his other real estate to collateral heirs; he gave Sue a cash legacy of $3,000.00, and Sue's son a cash legacy of $3,000.00; he also made cash bequests to other nephews and nieces in amounts totaling $15,500.00. He made Sue his sole executrix. These contesting nephews and nieces contend and the Auditing Judge held (1) that the testimony of Mr. Binns, who was president

of the bank at the time of the creation of the joint accounts, was admissible in evidence; (2) that his testimony was sufficiently clear, precise and indubitable to prove that decedent never intended to make an irrevocable gift to his niece Sue; (3) that the testator's testamentary bequests totaling several times the estate he possessed, constituted a bequest of the aforesaid savings account and checking account; and (4) that these bank accounts were a part of Peter's estate.

There are two theories under which Binns' evidence might be admissible: (1) mistake, and (2) lack of donative intent, which is the usual contention in these cases and is the one which is relied on by these contestants.

Mr. Binns testified—on behalf of the contesting nephews and nieces—and the lower Court found the following facts: The decedent wanted to change his accounts in order to enable Sue to pay his food, household and medical expenses. Binns refused to permit the bank to take that responsibility, and suggested, not a power of attorney, but a joint account with the niece. Furjanick was at first reluctant to do this, but after lengthy discussion with Binns, agreed to do so because he had confidence that Sue would do the right thing. The decedent knew what he was doing when he directed him (Binns) to change his accounts and created the joint accounts in question, and when he executed the signature cards and the written agreements, all of which Binns had explained to him carefully and in great detail.

In other words, the contestants proved that Furjanick clearly and unquestionably knew exactly what he was doing as well as the practical effects and legal consequences of his acts in opening the savings and checking accounts in the joint names, and executing with his niece Sue the agreement which clearly pro-

vided that the money in the accounts are and shall be owned by them (him and Sue) jointly with the right of survivorship; and that either (or both) had the right in his lifetime to withdraw the funds without any strings or conditions; and that upon his death the balance shall belong to his niece (the survivor), and that *the agreement was not revocable except by written notice signed by both of them.* The fact that these may not have been Furjanick's original desires, or that he was confident Sue would do the right thing —whatever that means—is immaterial and is utterly insufficient to prove "mistake".

That brings us to the next question: Was Binns' aforesaid testimony admissible and if so was it sufficient to prove lack of donative intent?

A statement of the applicable principles of law will aid us in answering these questions.

The deposit of cash in a savings account or checking account *in the name of the depositor in trust for "X"*, creates presumptively a tentative or revocable trust, but since it is incomplete there is ambiguity or doubt as to whether depositor intended a revocable trust or an irrevocable trust or absolute gift, or no trust at all, and consequently parol evidence is admissible in such cases to show what the actual intention of the depositor or donor was; and this intention can be shown by the statements, declarations, admissions, acts and conduct of the parties, at the time of as well as after and before the deposit: *Ingels Estate*, 372 Pa. 171, 183, 92 A. 2d 881; *Rodgers Estate*, 374 Pa. 246, 97 A. 2d 789; *Scanlon's Estate*, 313 Pa. 424, 169 A. 106; *Matter of Totten*, 179 N. Y. 112.

When a depositor creates a joint savings or checking (bank) account with right of survivorship, and a signature card so stating is executed by both parties, these facts are prima facie evidence of a gift inter

vivos by the depositor to the other, and of the creation of a joint tenancy with right of survivorship: *Fell Estate*, 369 Pa. 597, 87 A. 2d 310; *Lochinger v. Hanlon*, 348 Pa. 29, 33 A. 2d 1; *Mader et al. v. Stemler et al.*, 319 Pa. 374, 179 A. 719. A deposit accompanied by such a writing, but nothing more, is considered so incomplete or equivocal as to permit the admissibility of parol evidence: *Fell Estate*, 369 Pa., supra; but such evidence in order to prevail must be clear, precise and indubitable: *Fell Estate*, 369 Pa., supra; *Dempsey v. National Bank of Scranton*, 359 Pa. 177, 181, 58 A. 2d 14; *Mader et al. v. Stemler et al.*, 319 Pa. 374, 379, 179 A. 719.

The writings in the instant case were different from and went far beyond the writings or written instruments in the cases hereinabove mentioned, or in any other case (so far as our research has revealed). This was not a savings or checking account in the name of the depositor in trust for his niece, or a joint savings or checking account with an ambiguous title, or merely a joint savings account with right of survivorship. Nor was this a case of a bank account or trust created by fraud, accident or mistake, or undue influence; nor was the agreement permeated with uncertainty or ambiguity.

When Furjanick opened a new savings account and checking account in the joint names of himself and his niece and then he and his niece signed the aforesaid written agreement setting forth in detail the terms of the contract and the rights of the respective parties therein, the money in those accounts was thereafter *owned and held in exact accordance with the terms and provisions of that agreement. This was a complete and detailed agreement* which included a provision as to revocation, hence it could be revoked only as therein set forth.

Where no fraud, accident or mistake is averred and proved, parol evidence of a prior or contemporaneous oral representation or agreement which varies, modifies or conflicts with a (complete) written agreement, is inadmissible in evidence: *Phillips Gas and Oil Co. v. Kline,* 368 Pa. 516, 84 A. 2d 301; *Grubb v. Rockey,* 366 Pa. 592, 79 A. 2d 255; *Walker v. Saricks,* 360 Pa. 594, 63 A. 2d 9; *Gianni v. Russell & Co., Inc.,* 281 Pa. 320, 126 A. 791; *Speier v. Michelson,* 303 Pa. 66, 154 A. 127; *O'Brien v. O'Brien,* 362 Pa. 66, 66 A. 2d 309; *Russell v. Sickles,* 306 Pa. 586, 160 A. 610.

The parol evidence offered in the instant case was intended to overcome and nullify the provision of the written agreement, that ". . . this agreement is not revocable except, by written notice . . . signed by both depositors, . . .". We may appropriately ask, what is the use of inserting a provision as to revocation or any other provision in a complete and unambiguous written agreement, if oral testimony can vitiate and nullify the written agreement and set up an entirely different and conflicting agreement?

We have repeatedly said and we reiterate that we intend to uphold the integrity of written instruments and will not permit the Parol Evidence Rule to be circumvented or undermined.

Appellees rely mainly on two cases, the first of which is *Rodgers Estate,* 374 Pa. 246, 97 A. 2d 789. This Court there held that a *tentative trust* of a savings deposit can be revoked by the depositor by his will, either expressly, or by facts and circumstances resulting in inadequacy of the assets of the estate to satisfy funeral and administration expenses and testamentary gifts. That principle is inapplicable here because we repeat *this is not a tentative trust* but a complete and unambiguous written contract which by its

very terms is revocable only with the written consent of the depositor and the niece.

Appellees next most important case is *Dempsey v. First National Bank of Scranton*, 359 Pa. 177, 58 A. 2d 14. The facts in that case were unusual. That was an action of mandamus brought by Dempsey to have certain United States Treasury checks totaling $36,000.00 delivered to him.

Miss McCarty, a woman of about 80 years of age, was the owner of a savings account of $40,000.00. She went to the bank and instructed it to transfer these funds to a joint account in the names of Ellen E. McCarty or Mary G. Dempsey, or James J. Dempsey, Jr. The Dempseys were brother and sister but were not related to Miss McCarty. All three executed a signature card which provided that "In the event of the death of either of us, any balance in this account shall belong to the survivor,". Subsequently Dempsey withdrew from this account $36,000.00 and with this money purchased United States government bonds in his name or that of his sister. As soon as Miss McCarty learned of Dempsey's aforesaid cash withdrawal she sent for him and demanded an explanation and a return of the pass book and the bonds. Dempsey returned both. Dempsey admitted that in addition to these facts he wrote at Miss McCarty's request a letter to the bank directing it to deposit these funds to the credit of Miss McCarty. This letter Dempsey sought to repudiate after Miss McCarty's death and demanded a return of the money. This Court held that the burden of proving an inter vivos gift was on Dempsey and that the signature card, while prima facie evidence of a gift, did not conclusively establish donative intent, and that the evidence to prove a lack of donative intent was overwhelming. The facts in that case are so very dif-

ferent from the facts in the instant case as to make the two cases clearly distinguishable.

The question in this class of case ofttimes depends upon the exact wording of the deposit account and the card or agreement accompanying it. Do they clearly show the intention of the depositor, settlor, or contractor? If his intent is uncertain or ambiguous, parol evidence is admissible; if the writings clearly show an intent to make an absolute gift, or an irrevocable trust, or a specific and complete agreement between the parties, then in the absence of fraud, accident or mistake no subsequent acts or declarations of the donor or settlor or contractor can change or revoke or annul the gift, or trust, or contract, without the consent of the other party.

Decree reversed. Costs to be paid by appellees.

